## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| NPG, LLC d/b/a WELLNESS CONNECTION and HIGH STREET CAPITAL PARTNERS, LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 2:20-cv-00208-NT |
| | ) | |
| CITY OF PORTLAND, MAINE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS

Plaintiff Wellness Connection ("**Wellness**"), which is owned by Plaintiff High Street Capital Partners, LLC (collectively "**Plaintiffs**"), intends to operate an adult use retail marijuana store in Portland, Maine. In order to do so, Wellness must obtain a license from the City of Portland ("**the City**"). Pursuant to a local ordinance, the City will issue a maximum of twenty licenses, and those licenses will be awarded based on a point system. The Plaintiffs contend that the City's process for awarding licenses is unconstitutional, and they ask me to enjoin certain components of that process. Before me is the Plaintiffs' Motion for Preliminary Injunction (ECF No. 4) and the City's Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (ECF No. 7). For the reasons set forth below, I **GRANT** the Plaintiffs' motion and **DENY** the City's motion.

# BACKGROUND

## I.   Marijuana Legalization in Maine

Marijuana is a controlled substance, prohibited by federal law. 21 U.S.C. § 841(a)(1) (the "**Controlled Substances Act**"); 21 C.F.R. § 1308.11(d)(23) (listing marijuana among the Schedule I "[h]allucinogenic substances"). Despite this federal classification, medical marijuana has been legal in Maine for more than twenty years, and medical marijuana dispensaries have been allowed to operate for more than ten years. Def.'s Mot. 3 (citing 22 M.R.S. § 2428). In 2016, Maine voters approved a referendum to legalize the recreational use of marijuana, and in 2018 the Maine Legislature enacted the "Marijuana Legalization Act" to facilitate the development and administration of a regulated marketplace for adult use marijuana. *See* L.D. 1719 (128th Leg. Me. 2018); 28-B M.R.S. § 101. The State's Office of Marijuana Policy ("**OMP**") subsequently passed rules to implement the statute, including rules for the issuance of State marijuana retail licenses.[1] *See* 18-691 C.M.R. (2019); 28-B M.R.S §§ 103–04.

Under the Marijuana Legalization Act, a municipality can choose to permit adult use marijuana establishments within its jurisdiction by passing a local

---

[1]     Individual applicants and corporate officers for a corporation seeking a state adult use license must meet the following requirements: be at least 21 years of age, be incorporated in the state, not have a disqualifying drug offense, not be an employee of a state agency, not be a law enforcement or corrections officer, not have had a state marijuana license previously revoked, not have a registry identification card issued under the state medical marijuana statute revoked, not have had any other marijuana license or government-issued authorization revoked, not have outstanding court-ordered payments, submit to a criminal history record check, and comply truthfully with the application process. 28-B M.R.S. § 202. OMP also considers whether an applicant has been convicted of any offense involving fraud or dishonesty, its tax compliance, and other state marijuana-related violations. 28-B M.R.S. § 203.

ordinance.[2] 28-B M.R.S § 402(1). In municipalities that have decided to permit retail marijuana sales, applicants must follow several steps in order to begin conducting such sales. First, an applicant must obtain a conditional state license from OMP.[3] 28-B M.R.S § 402(1). Next, the applicant must apply for an adult use license from the municipality. 28-B M.R.S § 402(3); 28-B M.R.S § 205. If the applicant succeeds in obtaining local authorization, it must then return to OMP for an active license and final approval. 28-B M.R.S § 205(4). To receive an active license, a retailer must continue to meet the requirements for the conditional state license, pay the state license fee, and submit a plan detailing the location, size, and layout of the marijuana establishment. 28-B M.R.S § 205(4).

The Marijuana Legalization Act requires that an applicant for a state license be a resident or—in the case of a corporation—that every corporate officer be a resident and a majority of the shares of the corporation be held by Maine residents or Maine business entities. 28-B M.R.S § 202(2). The State subsequently decided not to enforce this residency requirement, because the Attorney General believed that the requirement was "subject to significant constitutional challenges and [was] not

---

[2]    Municipalities also have the authority to authorize certain types of marijuana businesses, including retail, cultivation, manufacturing, and testing; to put restrictions on the operation of adult use facilities; and to prohibit all recreational use businesses. 28-B M.R.S § 401; Def.'s Mot. 3 (ECF No. 7).

[3]    To date, 23 applicants have obtained conditional licenses from the State to operate recreational marijuana retail stores in Portland, and several other applicants have obtained conditional licenses but have not yet specified a municipality. *See* OMP, Adult Use Applications in Conditional Status, available at https://www.maine.gov/dafs/omp/open-data/adult-use (last visited August 14, 2020).

likely to withstand such challenges." *See* Stipulation of Dismissal (ECF No. 9), *NPG LLC v. Me. Dept. of Admin. and Fin. Servs.*, No. 1:20-cv-00107-NT.

## II.    Portland's Adult Use Marijuana Licensing Scheme

In May of 2020, the Portland City Council enacted Chapter 35 of the City of Portland Code of Ordinances, which permits 20 adult use retail stores in the city. *See* City Code § 35-43(i). To allocate those adult use licenses, the City grades applications using the following points matrix:

| Criteria | Points |
|---|---|
| At least 51% owned by socially and economically disadvantaged individual(s), as defined further by regulations to be promulgated by the City Manager based off of the Small Business Association Section 8(a) regulations. | 6 |
| At least 51% owned by individual(s) who have been a Maine resident for at least five years. | 5 |
| Owned by individual(s) with experience running a business in a highly regulated industry, such as marijuana, liquor, banking, etc. with no history of violations or license suspensions or revocations. | 6 |
| Owned by individual(s) who have previously been licensed by the State of Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of 5 years | 4 |
| Owned by individual(s) who have been a registered caregiver in the State of Maine for at least two years. | 3 |
| Ownership of proposed retail location by applicant; or at least five year lease for proposed retail location. | 4 |
| Evidence of at least $150,000 in liquid assets | 2 |
| Business plan committing to social and economic development, by including three or more of the following:<br><br>    1. Create at least five (5) full-time jobs paying a minimum of $15/hr;<br><br>    2. Provide PTO (or vacation/sick time) and health benefits to employees; | 4 |

> 3. Provide at least one annual training around diversity, cultural awareness, sexual harassment, or workplace violence. Training must be in addition to any required by the State or City;
>
> 4. Annual contribution of 1% net profits as a restricted donation to the City for youth education on substance use education and prevention.

City Code § 35-14(f)(3)–(4) (ECF No. 4-1). The twenty applicants with the highest scores are awarded municipal licenses. However, an applicant will not receive a municipal license if it is located within 250 feet of another applicant with more points. City Code § 35-14. The application period for the first round of licensing began on July 1, 2020, and will close on August 31, 2020. Def.'s Mot. 4.

As the rubric shows, five of the available 34 points are awarded if the applicant is "[a]t least 51% owned by individual(s) who have been a Maine resident for at least five years." City Code § 35-14(f)(3). A further four points are granted if the applicant is "[o]wned by individual(s) who have previously been licensed by the State of Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of 5 years." City Code § 35-14(f)(3). In deciding to retain these factors even after the State abandoned its residency requirement, City Councilmembers suggested that the City intended to "advantage or give a slight preference for individuals and entities that have been Maine residents," and to "allow[ ] the local market to grow before there was an opportunity for outside investment to come in." Portland City Council Meeting (May 18, 2020) at 3:42:52–3:43:30; 3:45:15–3:47:20, available at https://reflect-pmc-

5

me.cablecast.tv/CablecastPublicSite/show/15380?channel=1 (last visited August 14, 2020) ("**City Council Meeting**").

### III.   The Plaintiffs

Wellness operates the sole medical marijuana dispensary in Portland. Comments of Wellness Connection of Maine, 685 Congress Street, regarding Marijuana Business Licenses Ordinance 1 ("**Wellness Comments**") (ECF No. 7-3). Wellness is 100% owned by High Street Capital, a Delaware corporation that is at least 95% owned by non-Maine residents and companies. Decl. of Ron A. MacDonald ¶¶ 3–4 ("**MacDonald Decl.**") (ECF No. 4-2); Decl. of Kevin Murphy (ECF No. 4-3).

Wellness has applied to OMP for multiple adult use retail licenses throughout the state. MacDonald Decl. ¶ 5. The company has received a conditional state license from OMP to apply for an adult use retail license in Portland. NPG Conditional License (ECF No. 9-1). Wellness intends to apply for that retail license in Portland before the application window closes on August 31, 2020. *See* MacDonald Decl. ¶ 6; Def.'s Mot. 4.

### IV.   Procedural History

On June 15, 2020, the Plaintiffs filed a Complaint seeking declaratory and injunctive relief (ECF No. 1) and a motion for a preliminary injunction. Pls.' Mot. (ECF No. 4). I reserved ruling on the motion until the Plaintiffs served the Defendant and the Defendant had the opportunity to respond. Order (ECF No. 5). The City filed a combined opposition to the motion for preliminary injunction and a motion to dismiss. Def.'s Mot. (ECF No. 7). The Plaintiffs filed a combined reply to their motion

and opposition to the City's motion. Pls.' Reply (ECF No. 9). Finally, the City filed a reply in support of its motion to dismiss. Def.'s Reply (ECF No. 12).

## DISCUSSION

### I.     The City's Motion to Dismiss

The City asserts that this case should be dismissed under Federal Rule of Civil Procedure Rule 12(b)(1) because the Plaintiffs lack standing and because the Plaintiffs' claims are not ripe. Def.'s Mot. 2. Since those arguments raise jurisdictional concerns, I address them first. *See Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) ("A federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims. . . ."); *see also Shell Offshore Inc. v. Greenpeace*, 864 F. Supp. 2d 839, 842 (D. Alaska 2012) ("A district court may not grant a preliminary injunction if it lacks subject matter jurisdiction over the claim before it."). The City's third basis for dismissal—failure to state a claim pursuant to Rule 12(b)(6)—is discussed in conjunction with the Plaintiffs' preliminary injunction motion.

### A.     Legal Standard

A motion to dismiss under Rule 12(b)(1) challenges a court's subject-matter jurisdiction.[4] The Constitution restricts the jurisdiction of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, and "[t]hat limitation . . . is fundamental

---

[4]     Unlike a motion under 12(b)(6), a court considering a motion under 12(b)(1) may consider materials outside the pleadings. *Groden v. N&D Transp. Co.*, 866 F.3d 22, 24 n.3 (1st Cir. 2017) (citing *González v. United States*, 284 F.3d 281, 288 (1st Cir. 2002)); *Carroll v. United States*, 661 F.3d 87, 94 (1st Cir. 2011).

to the federal judiciary's role within our constitutional separation of powers." *Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)); *see also Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 221 (1st Cir. 2019) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (alteration in original and quotations omitted). District courts have an obligation to ensure that they have jurisdiction over a case before proceeding to the merits. *Olsen v. Hamilton*, 330 F. Supp. 3d 545, 551 (D. Me. 2018) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998)).

Both standing and ripeness are "interrelated" components of this constitutional requirement. *Reddy*, 845 F.3d at 499–500. The doctrine of standing serves to "identify those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of* Wildlife, 504 U.S. 555, 560 (1992). To show that she has Article III standing, a plaintiff must establish " '(1) an injury in fact which is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) that the injury is fairly traceable to the challenged action, and (3) that it is likely . . . that the injury will be redressed by a favorable decision.' " *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quoting *U.S. Dep't of Health & Human Servs.*, 923 F.3d at 221–22). An injury is "concrete" if it is real and not abstract, *id.* (quoting *Spokeo*, 136 S. Ct. at 1548), and

it is "particularized" if it " 'affects the plaintiff in a personal and individual way.' " *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560).

"Whereas standing asks 'who' may bring a claim, ripeness concerns 'when' a claim may be brought." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 32 (1st Cir. 2007). The ripeness doctrine "seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Reddy*, 845 F.3d at 500 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (explaining that the purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements") (internal quotations omitted). In assessing whether a claim is ripe, I evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Generally, both prongs must be satisfied for a claim to be ripe. *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013).

The fitness prong "has both jurisdictional and prudential components." *Id.* The jurisdictional component "concerns whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." *Id.* The key question of this component is " 'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all,' thus rendering any opinion [I] might offer advisory." *Algonquin Gas Transmission, LLC. v. Weymouth, Mass.*, 919 F.3d 54, 62 (1st Cir. 2019) (quoting

*Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995)). The prudential component "asks whether resolution of the case turns on legal issues not likely to be significantly affected by further factual development." *Id.* (internal quotations omitted). The underlying idea is that, "if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision." *Roman Catholic Bishop*, 724 F.3d at 89 (internal quotations omitted); *see also Ernst & Young*, 45 F.3d at 535 ("This [fitness] branch of the test typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed.").

The hardship prong of the ripeness inquiry is "entirely prudential" and "evaluates the extent to which withholding judgment will impose hardship." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (internal quotations omitted). In answering this question, a court considers "whether the challenged action creates a direct and immediate dilemma for the parties," *Algonquin Gas Transmission*, 919 F.3d at 62 (internal quotations omitted), and "whether granting relief would serve a useful purpose," *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011) (internal quotations omitted).

In many cases, such as this one, Article III standing and ripeness issues "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (internal quotations omitted); *see also Foisie v. Worcester Polytechnic Inst.*, --- F.3d ----, 2020 WL 4249670, at *3 (1st Cir. July 24, 2020) ("The constitutional

10

standing and ripeness inquiries are interrelated and often duplicative."). "Much as standing doctrine seeks to keep federal courts out of disputes involving conjectural or hypothetical injuries, the Supreme Court has reinforced that ripeness doctrine seeks to prevent the adjudication of claims relating to 'contingent future events' " that might not occur. *Reddy*, 845 F.3d at 500 (quoting *Texas*, 523 U.S. at 300).

Establishing subject-matter jurisdiction is the plaintiff's burden, *id.* at 500–01, but I treat all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor. *Portland Pipe Line Corp. v. City of S. Portland*, 164 F. Supp. 3d 157, 174 (D. Me. 2016); *see also Lyman v. Baker*, 954 F.3d 351, 359–60 (1st Cir. 2020) (noting that same basic principles apply for analyses under both Rules 12(b)(1) and 12(b)(6)). A plaintiff can survive a 12(b)(1) motion to dismiss if she "plausibly plead[s] facts necessary to demonstrate standing to bring the action," though "[c]onclusory assertions or unfounded speculation will not suffice." *Dantzler*, 958 F.3d at 47.

### B.   Analysis of the City's Motion

The City asserts that the Plaintiffs lack standing to challenge the licensing scheme because the Plaintiffs have failed to satisfy the first element of standing— identification of an actionable injury. Specifically, the City asserts that "no harm to Wellness has occurred or is even sufficiently imminent." Def.'s Mot. 12. The City explains that "there are numerous other events that would need to happen in order for Wellness to be denied a license," including that at least twenty other applicants apply for licenses, that those applicants obtain conditional state licenses, that those applicants qualify for more points than Wellness under the matrix, that those applicants are located more than 250 feet from another applicant with more points,

and that those applicants open stores within one year.[5] Defs.' Mot. 12. The City emphasizes that Wellness has "not been denied an adult use marijuana retail license" and has "not even applied for such a license." Def.'s Mot. 11–12. Given these facts, the City argues that the Plaintiffs have "not put forth any evidence of actual harm, nor have they asserted any facts that would demonstrate more than mere 'potential' of harm." Def.'s Mot. 12.

According to the City, these contingencies also render the Plaintiffs' claims unripe and unfit for judicial review. Def.'s Mot. 13 (stating that Plaintiffs' "claim depends on a series of uncertain events that may or may not occur in the future"). The City adds that, because "residency is not an absolute bar but instead is one of many factors," it is not futile for Wellness to apply for a license. Def.'s Mot. 14. In terms of the hardship prong, the City states that "there is no impediment to Wellness moving forward without a decision from this Court," noting that Wellness "will apply for its adult use marijuana license . . . regardless of the outcome of this case." Def.'s Mot. 14–15.

In response, the Plaintiffs argue that the City misrepresents the asserted injury. Specifically, the Plaintiffs assert that the points matrix creates an "injury-in-fact" by "denying Plaintiffs the opportunity to participate in Portland's licensing process on equal footing with other applicants, free of the unconstitutional disadvantage the points matrix creates by basing over 25% of the available points on

---

[5]     The City also stated that Wellness had not yet obtained a conditional license from the State, but it appears that Wellness has since satisfied this requirement. *See* NPG Conditional License (ECF No. 9-1).

residency." Pls.' Reply 14. Because the injury is an inability to compete on equal footing, the Plaintiffs continue, the "Court need not entertain the 'contingencies' " raised by the City. Pls.' Reply 14. Nevertheless, the Plaintiffs add that it is "implausible or entirely hypothetical" to suggest that the points matrix will not be used to award licenses, noting that the State has already issued conditional licenses to more than twenty applicants with planned locations in Portland. Pls.' Reply 15. Even if other events occurred to reduce the number of valid applications so that the points matrix was not used, the Plaintiffs contend that they currently face "the 'substantial risk' . . . that the City will use the unconstitutional points matrix to award licenses." Pls.' Reply 15 (citing *Portland Pipe Line*, 164 F. Supp. 3d at 179–80).

The Plaintiffs also argue that both prongs of the ripeness inquiry weigh in their favor. Their case is fit for review, they assert, because their inability to compete on equal footing exists "now and is not dependent on future contingencies or a change in circumstances." Pls.' Reply 18. Moreover, the Plaintiffs emphasize that their claims are "entirely legal in nature" and "not 'bound up in the facts.' " Pls.' Reply 18. Finally, the Plaintiffs maintain that they and the City "are squarely adverse now," particularly because Wellness has obtained a conditional license from the State, and they contend that a decision in their favor would "level[ ] the playing field and eliminat[e] the unconstitutional factors in the City's points matrix before the matrix is used to award licenses." Pls.' Reply 18. The Plaintiffs highlight this last point in arguing that withholding judgment will impose hardship on them, noting that "the City intends to issue licenses this summer, and once the licenses are issued, the harm

cannot easily be redressed." Pls.' Reply 19 (explaining that the remedy at that point would require rescinding licenses or ordering the City to issue more than 20 licenses, "thereby undoing the licensing scheme" that the City created to prevent over-saturation of the market).

I conclude that the Plaintiffs have alleged a concrete injury. Although the Plaintiffs have not been denied a license, their alleged injury is not the denial itself but the disadvantage they face in obtaining a license due to the City's points matrix. This injury is not conjectural or speculative because, viewing the facts in the Plaintiffs' favor, there is every indication that there will be more than twenty applicants and that the City will apply the points matrix. *See* OMP, Adult Use Applications in Conditional Status, available at https://www.maine.gov/dafs/omp/open-data/adult-use (last visited August 14, 2020) (identifying 23 entities that have obtained conditional licenses to operate in Portland). There is thus a "sufficient threat" that the Plaintiffs will be forced to compete at a disadvantage. *Dantzler*, 958 F.3d at 47 (citing *Katz v. Pershing, LLC.*, 672 F.3d 64, 71 (1st Cir. 2012)). Moreover, the Plaintiffs' asserted injury is "impending," and there is "some immediacy" associated with it, as the Plaintiffs have obtained their state conditional license and the next hurdle in their quest is approval from the City. *McInnis-Misenor*, 319 F.3d at 68. And, finally, the Plaintiffs are the proper party to bring these claims because they are a nonresident entity that intends to apply for an adult use retail license from the City. They thus have "a personal stake

in the outcome of the controversy." *Gill*, 138 S. Ct. at 1929 (internal quotations omitted).

I also conclude that the Plaintiffs' claims are ripe. The claims are fit for review in part because they are legal in nature. Although whether the Plaintiffs will succeed in obtaining a license under the current scheme is uncertain and would be cleared up through further factual development, the question of whether the licensing scheme itself is unconstitutionally discriminatory does not depend on future events.[6] The case thus turns "on legal issues 'not likely to be significantly affected by further factual development.' " *McInnis-Misenor*, 319 F.3d at 70 (quoting *Ernst & Young*, 45 F.3d at 536).

In terms of whether withholding judgment would impose hardship on the Plaintiffs, it is true that Wellness might still obtain a license and thus, ultimately, might suffer no lingering hardship. But I note that the hardship prong is a prudential limitation, not a constitutional one. *Algonquin Gas Transmission*, 919 F.3d at 62. There are two apparent problems with waiting to see if Wellness secures enough points to proceed to final approval. First, Wellness might obtain enough points based on the current matrix to land within the top twenty applicants, but—because of the residency-related criteria—it could still have fewer points than an applicant within 250 feet, thus dooming its application. Second, if Wellness is denied a license— whether through the example above or because it falls outside the top twenty

---

[6]     Given the express preference for entities with 51% ownership by Maine residents, this is not a case where the challenged statute is facially neutral and nondiscriminatory and thus the plaintiff would need to show discriminatory effect or purpose through other facts.

applicants—a subsequent ruling that the licensing scheme is unconstitutional could throw a wrench into the process, particularly in light of the 250-foot buffer rule.[7] These considerations suggest that a ruling now on the constitutionality of the points matrix would " 'serve a useful purpose.' " *Verizon New England, Inc.*, 651 F.3d at 188 (quoting *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994)).

Considering the facts in the light most favorable to the Plaintiffs, I conclude that the Plaintiffs have demonstrated a " 'direct and immediate' dilemma" sufficient for ripeness purposes. *Ernst & Young*, 45 F.3d at 535 (quoting *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992)); *see also Portland Pipe Line Corp.*, 164 F. Supp. 3d at 179.

## II.    Preliminary Injunction[8]

The Plaintiffs seek a preliminary injunction enjoining the City from enforcing the two criteria of the points matrix that they say create an unconstitutional preference for Maine residents. The Plaintiffs contend that these criteria

---

[7]     The 250-foot buffer rule shows why the initial ranking of applicants matters. Applicants with more points have preference over other applicants within 250 feet. If the awarding of points is found to be unconstitutional, that ranking could change and thus the corresponding qualification and disqualification of applicants could change.

[8]     The City moves to dismiss the case for failure to state a claim. Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Such a motion may be based on "(1) a challenge to the sufficiency of the pleading under Rule 8(a)(2); or (2) a challenge to the legal cognizability of the claim." *Fusco v. Rogers*, No. 2:18-cv-00290-JAW, 2019 WL 1387686, at *2 (D. Me. Mar. 27, 2019) (internal quotations omitted). Because the crux of the City's argument is that the Plaintiff has not identified a cognizable claim, this issue overlaps with the Plaintiffs' likelihood of success, albeit with a different legal standard. Because I find that the Plaintiffs are likely to succeed on the merits, I also find that the Plaintiffs have stated a claim, and I deny the City's motion to dismiss.

discriminate against nonresident applicants in violation of the dormant Commerce Clause.

### A.      Legal Standard

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)). In deciding whether to issue a preliminary injunction, I consider four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17–18 (1st Cir. 2006) (internal quotations omitted). The moving party "bears the burden of establishing that these four factors weigh in its favor," *id.* at 18, but the likelihood of success on the merits is the most important. *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). If the movant "cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Id.*

### B.      Analysis of Plaintiffs' Motion

#### 1.      Likelihood of Success on the Merits

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Although the Commerce Clause only contains an

17

affirmative grant of power, "[o]ver time, courts have found a negative aspect embedded in this language—an aspect that prevents state and local governments from impeding the free flow of goods from one state to another." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999). This "dormant Commerce Clause" prohibits "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 10 (1st Cir. 2007) (internal quotations omitted); *see also Davis*, 553 U.S. at 337–38. The dormant Commerce Clause is intended "to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation . . . that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Davis*, 553 U.S. at 337–38 (internal quotations and citations omitted and alterations adopted).

To this end, a state or local law that "discriminates on its face against interstate commerce, whether in purpose or effect, demands heightened scrutiny." *Wine & Spirits Retailers*, 481 F.3d at 10. I must invalidate such a law "unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means."[9] *Id.* at 10–11; *see also Tenn. Wine & Spirits Retailers Ass'n v.*

---

[9]     Statutes that "regulate[ ] evenhandedly and ha[ve] only incidental effects on interstate commerce engender[ ] a lower level of scrutiny." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007) (internal quotations omitted). Such statutes "will stand 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.' " *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The City contends that that the licensing scheme must be analyzed "as a whole," adding that "other factors may tend to favor out-of-state entities." Def.'s Mot. 15–17. But the City does not appear to argue that the residency factors themselves are facially neutral. Nor does the City develop any argument about how the other factors can remedy the clear disadvantage faced by nonresidents. Of the 34 available points, nonresidents are facially precluded from at least five points and likely precluded from a total of nine. Those factors thus endorse the "differential treatment of in-state and out-of-state economic interests that benefits the

*Thomas*, 139 S. Ct. 2449, 2461 (2019) ("[A] state law [that] discriminates against out-of-state goods or nonresident economic actors . . . can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose.") (internal quotations omitted and alterations adopted). The plaintiff bears the initial burden of showing discrimination, but the state or local government bears the burden of identifying legitimate local purposes and establishing a lack of non-discriminatory alternatives. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

Importantly, congressional action can alter the application of the dormant Commerce Clause. As the Supreme Court recently stated, "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2465. Thus, Congress "may use its powers under the Commerce Clause to '[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1983) (quoting *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44 (1980)). The standard for finding such congressional consent is "high," and the state or local jurisdiction has the burden of demonstrating Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers v. Dep't*

---

former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (internal quotations omitted). Merely suggesting that nonresident entities *might* benefit from the other factors cannot overcome that facially differential treatment and does not show that the licensing scheme "regulates evenhandedly." *See Wine & Spirits Retailers*, 481 F.3d at 11; *see also Walgreen Co. v. Rullan*, 405 F.3d 50, 58–59 (1st Cir. 2005) (rejecting argument that "a favored group must be entirely in-state for a law to have a discriminatory effect on commerce" and explaining that a statute can discriminate against commerce if "it favor[s] a class comprised *mostly* of [in-state] interests") (emphasis in original).

*of Agric. of P.R.*, 77 F.3d 567, 570 (1st Cir. 1996); *see also Maine v. Taylor*, 477 U.S. 131, 138–39 (1986) ("[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.' "); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430–32 (3d Cir. 2011).

The Plaintiffs argue that two components of the points matrix violate the dormant Commerce Clause—the five points for entities that are at least 51% owned by individuals who have been Maine residents for at least five years and the four points for entities that are owned by individuals who have been previously licensed for a non-marijuana-related business in Maine. Pls.' Mot. 5. Both provisions, they contend, " 'plainly favor[ ]' Mainers over non-residents." Pls.' Mot. 7 (quoting *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2462). Moreover, they argue that the City "cannot demonstrate a legitimate local purpose for the residency preference," noting that the City Council "was clear that the point of the residency preference is to . . . 'advantage . . . individuals and entities that have been Maine residents, local businesses, smaller businesses.' " Pls.' Mot. 10 (quoting City Council Meeting at 3:42:52–3:43:30, 3:45:15–3:47:20).

As is clear from the text of the licensing scheme and the statements by councilmembers, the City sought to create a preference for resident-owned marijuana retail stores.[10] *See* City Council Meeting at 3:42:52–3:43:30, 3:45:15–3:47:20

_____

[10]    The City is not in the clear simply because marijuana will not be traversing state lines. The dormant Commerce Clause "prohibits state discrimination against all out-of-state economic *interests*,"

(discussing goal of "allowing the local market to grow before there was an opportunity for outside investment to come in"). Rather than disputing the discriminatory character of the residency preference factors, the City attempts to argue that the licensing of marijuana retail stores operates in a unique dimension, noting that "[m]arijuana has been, and remains, a Schedule I drug under the [Controlled Substances Act]."[11] Def.'s Mot. 8–9.

As noted, Congress can "redefine the distribution of power over interstate commerce" by expressly authorizing otherwise invalid state legislation. *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 91–92 (1984) (internal quotations omitted) (explaining that the "requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine"). But it is unlikely that the City will be able to meet its burden of demonstrating unmistakably clear congressional intent

---

not just discrimination "against products or producers." *Tenn. Wine & Spirits*, 139 S. Ct. at 2471 (internal quotations omitted, emphasis in original); *see also C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994) ("Discrimination against interstate commerce in favor of local business or investment" is subject to "rigorous scrutiny"). Moreover, the Supreme Court has already held that Congress's power can extend to the regulation of the intrastate manufacture and possession of marijuana. *See Gonzales v. Raich*, 545 U.S. 1, 22 (2005).

[11]     The City argues that marijuana is "contraband" and thus sales of marijuana do not enjoy dormant Commerce Clause protections. Def.'s Mot. 8–10. In making that argument, the City cites a case where the product at issue was considered contraband under both state and federal law. Def.'s Mot. 9–10 (citing *New York v. Grand River Enters. Six Nations, Ltd.*, No. 13-CV-910A(f), 2020 U.S. Dist. LEXIS 44451 (W.D.N.Y. Mar. 10, 2020) (untaxed cigarettes)). But, here, the City is actively and voluntarily creating a market for recreational marijuana retail sales. I am unpersuaded that the City can legalize and promote marijuana sales on the one hand, while simultaneously labeling marijuana as contraband in order to justify discrimination against nonresidents who seek to participate in the market.

to permit the sort of in-state preference found in the points matrix.[12] *See Am. Trucking Ass'ns, Inc. v. Alviti*, C.A. No. 18-378-WES, 2020 WL 4050237, at *2 (D.R.I. July 20, 2020).

The City portrays the Controlled Substances Act as a form of congressional consent.[13] Def.'s Mot. 10 (arguing that the Plaintiffs "cannot make out a case for protection under the dormant Commerce Clause" because "Congress has exercised its right to regulate marijuana under the Commerce Clause . . . and has chosen to prohibit it"). But the Act nowhere says that states may enact laws that give preference to in-state economic interests.[14] In other words, although the Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states the power to "burden interstate commerce 'in a manner which would otherwise not be permissible.'" *New England Power Co.*, 455 U.S. at 341 (quoting *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769 (1945)). And I have no authority to invent such an affirmative grant where Congress has not provided it.[15] *See id.* at 343 ("[W]hen

---

[12]    Another problem with the City's position is that the Supreme Court recently reiterated that "the Commerce Clause [does] not permit the States to impose protectionist measures clothed as police-power regulations." *Tenn. Wine & Spirits*, 139 S. Ct. at 2468.

[13]    Given the State's position that its residency requirement is likely unconstitutional, it is unclear to me how the City can take the position that the dormant Commerce Clause is inapplicable in the recreational marijuana context.

[14]    Section 903 of the Controlled Substances Act discusses the "Application of State Law," but it simply states that nothing in the Act "shall be construed as indicating an intent on the part of the Congress to occupy the field . . . to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State." 21 U.S.C. § 903.

[15]    As the Plaintiffs note, the "Rohrabacher-Farr Amendment, passed in 2014 and renewed by Congress each year since, prohibits the U.S. Department of Justice from using federal funds to interfere with the implementation of state medical marijuana laws." Pls.' Mot. 11; *see* Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014). But that amendment speaks only to medical marijuana, not the recreational marijuana sales at issue here. Congress has simply not spoken on whether the states that have legalized recreational marijuana are allowed to enact laws that would violate the dormant

Congress has not expressly stated its intent and policy to sustain state legislation from attack under the Commerce Clause, . . . [courts] have no authority to rewrite its legislation based on mere speculation as to what Congress probably had in mind.") (internal quotations omitted).

Because I conclude the dormant Commerce Clause likely restricts the City's licensing of marijuana retail stores, the burden falls on the City to justify its licensing scheme. "State laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005)). Theoretically, the City could save the residency preference factors if it showed that those factors "advance[ ] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Davis*, 553 U.S. at 338 (internal quotations omitted). But that purpose must be "distinct from the simple economic protectionism the [dormant Commerce Clause] abhors," *id.* at 341, and "justifications for discriminatory restrictions on commerce [must] pass the 'strictest scrutiny.'" *Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality of Ore.*, 511 U.S. 93, 101 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979)). The City would need to "present[ ] 'concrete record evidence,' and not 'sweeping assertions' or 'mere speculation,' to substantiate . . . claims that the discriminatory aspects of its challenged policy are necessary to

---

Commerce Clause. Specific affirmative authorization is required. *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 571 (1st Cir. 1996) ("Absent, at least, an affirmatively stated grant of permission to noncontiguous jurisdictions of the United States to require egg-labeling [that identifies the egg's state of origin], we are unable to conclude that appellants have met their burden of showing that Congress' intent to allow Puerto Rico to enact protectionist egg-labeling regulations was 'unmistakably clear.'").

achieve its asserted objectives." *Family Winemakers of Cal.*, 592 at 17 (quoting *Granholm*, 544 U.S. at 492–93).

The City offers little to substantiate its claims that the residency factors are necessary to achieve its asserted purposes. It contends that the reason for the local preferences "was to ensure that the City understood the amount and quality of oversight and could easily verify any past violations." Def.'s Mot. 17. Although this argument is undeveloped, and likely waived at this juncture, it is also unsupported.[16] *See Family Winemakers of Cal.*, 592 F.3d at 17. At this stage, given the express language in the points matrix and the statements by City officials suggesting a protectionist purpose, I conclude that the City is unlikely to succeed in justifying the residency preferences in its points matrix. *See Granholm*, 544 U.S. at 492–93 (explaining that the "burden is on the State to show that the *discrimination* is demonstrably justified" and noting that the "Court has upheld state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory alternatives will prove unworkable") (internal quotations omitted).

### 2. Remaining Factors

Although the likelihood of success on the merits is the most important of the four factors used in evaluating a motion for a preliminary injunction, I will briefly discuss on the remaining factors.

---

[16]    I also note that the State has an elaborate vetting process that would likely identify past violations. *See supra* note 1.

First, I consider the potential irreparable harm to the Plaintiffs if I decline to issue a preliminary injunction. The Plaintiffs argue that, if their motion is not granted, they will be harmed because Wellness will face a "significant disadvantage" in obtaining a retail license. Pls.' Mot. 14. Even if they eventually prevail on the merits, the Plaintiffs note that the City may have already awarded its 20 licenses and that it would be difficult to recover damages against the City because "it is not possible to measure lost profits in the context of a start-up business in a new market." Pls.' Mot. 14. The Plaintiffs further point to the "unique and fleeting business opportunity offered by [participating in] Portland's retail marijuana market at the moment of its creation," arguing that an inability to take advantage of that opportunity would injure their economic prospects and their ability "to establish goodwill" in the new market. Pls.' Mot. 15–16.

I agree that the unique context of this new market suggests that the timing of a ruling in the Plaintiffs' favor is particularly important. The Plaintiffs are not seeking to enter an established market, where the significance of any further delay of their participation is likely diminished. Rather, the Plaintiffs are seeking to be in the first wave of licensees as a new market launches and are hoping to attract customers who have not yet developed allegiances. The City counters that the Plaintiffs' asserted harm could "easily be remedied by further government action" and is thus not irreparable.[17] Def.'s Mot. 18. But that still misses the point about timing.

---

[17]    The City also attempts to argue that the Plaintiffs will not suffer any harm to their goodwill because the Plaintiffs will be able to continue to operate their medical marijuana dispensaries. Def.'s

Because protracted litigation could exacerbate the harm to the Plaintiffs by extending and calcifying a competitive disadvantage and because such harm is difficult to quantify, I conclude that the Plaintiffs have identified an irreparable injury.

Next, I consider the balance of the hardships on the parties. The hardship to the Plaintiffs if I decline to issue a preliminary injunction must be weighed against the hardship to the City—and relatedly to the public—if the preliminary injunction is granted. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (harm to opposing party and public interest merge when government is party). The City contends that, "[i]f an injunction is granted, none of the City's adult use marijuana retail hopefuls will be able to move forward with their business plans and their licensing," potentially resulting in Portland falling behind the rest of the State's markets. Def.'s Mot. 19.

I agree that further delay of this licensing process is a harm to the City and the public. But the City does not explain why it cannot move forward with granting licenses using a points matrix that omits the factors related to residency—or perhaps retools those factors to omit the discriminatory elements. In other words, the City has not identified any reason why the residency preference factors are not severable from the rest of the licensing scheme. *See Kittery Retail Ventures, LLC v. Town of Kittery*, 856 A.2d 1183, 1190 (Me. 2004) ("An invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would have only

---

Mot. 18. But the Plaintiffs' continued operation of those dispensaries does not mean they will not miss out on establishing goodwill in an entirely new market.

enacted the legislation as a whole."). Moreover, the City and the public could also face hardship if I deny the Plaintiffs' motion and later hold that the points matrix is unconstitutional. In that case, the City might have to alter its licensing scheme by issuing an additional license to Wellness, perhaps in excess of the 20-license limit that the City deems important for preventing over-saturation of the market. *See* Def.'s Mot. 1. I conclude that the harm to the Plaintiffs outweighs the harms that the City has identified.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for a preliminary injunction (ECF No. 4). The City is preliminarily enjoined from applying two criteria in the points matrix as currently written: the factor that gives five points to entities that are at least 51% owned by individual(s) who have been a Maine resident for at least five years and the factor that awards four points to entities that are owned by individual(s) who have previously been licensed by the State of Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of five years. The Court **DENIES** the Defendant's motion to dismiss (ECF No. 7).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 14th day of August, 2020.